UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FILED OCT 24 2011 MICHAEL J. ROEMER, CLERK WESTERN DISTRICT OF NY

SHANE CHRISTOPHER BUCZEK, a U.S. Trust

Plaintiff,

v.

UNITED STATES of America

Defendant(s).

NOTICE OF APPEAL

10-cv-382 ✓

09-CR-121 WDNY

Notice of Appeal

Notice is hereby given that Shane-Christopher: Buczek [print your name], Plaintiff, Secured Party [identify yourself as plaintiff or defendant in the district court action] All Rights Reserved in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from ✓ (all) part [check one] of the decision of this Court entered on September 29, 2011. Courts Cannot proceed without jurisdiction AND CAN not be assume 167 LED 20, 549 U.S. 422 SINOCHEM INT V. MALAYSIA INT'L [Complete the next section only if you are not appealing the whole order.] I am appealing from the part of the order which Reason of Appeal Denied, Violation of the Constitutional Rights "Due Process" of the Law See: Arnold F. Hohn v. U.S. 524 US 236, 141 LEd 242, 118 S Ct 1969

Dated: October 20, 2011

By: Shane-Christopher: Buczek
Signature All Rights Reserved
Executor of the estate
Shane-Christopher: Buczek
Print Your Name ; UCC 1-308
Appearing Pro Se - Secured Party Creditor

Address: 407335 Derby Road
Derby, New York [14047]

Telephone: 716-947-5384

Without out the U.S. NonDomestic
NOT A PERSON
Common law Jurisdiction

* See: 77 LED 1356, 289 US 516 O'DONOGHUE V. UNITED STATES
* See: 22 LED 227, 394 US 217 KAUFMAN V. UNITED STATES
Constitutional Republic 50 Sovereign State
✗ See Attachment → Enclosed

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHANE CHRISTOPHER BUCZEK, a U.S. TRUST

Plaintiff,

V.

UNITED STATES of AMERICA

Defendant,

No. 10-CV-382
10-CV-383
10-CV-384

## STATEMENT OF ISSUES

by: Shane-Christopher: Buczek agent FOR:
Third Party - Secured Party    SHANE C BUCZEY
a U.S TRUST

Formal → ADMINISTRATIVE NOTICE of APPEAl

:* *63C Am.Jur.2d, Public Officers and Employees, §247* "As expressed otherwise, the powers delegated to a public officer are held in trust for the people and are to be exercised in behalf of the government or of all citizens who may need the intervention of the officer. [1] Furthermore, the view has been expressed that all public officers, within whatever branch and whatever level of government, and whatever be their private vocations, are trustees of the people, and accordingly labor under every disability and prohibition imposed by law upon trustees relative to the making of personal financial gain from a discharge of their trusts. [2] That is, a public officer occupies a fiduciary relationship to the political entity on whose behalf he or she serves. [3] and owes a fiduciary duty to the public. [4]   It has been said that the fiduciary responsibilities of a public officer cannot be less than those of a private individual. [5]   Furthermore, it has been stated that any enterprise undertaken by the public official who tends to weaken public confidence and undermine the sense of security for individual rights is against public policy. Fraud in its elementary common law sense of deceit-and this is one of the meanings that fraud bears [483 U.S. 372] in the statute. See United States v. Dial, 757 F.2d 163, 168 (7th Cir1985) includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public, including, in the case of a judge, the litigants who appear before him and if he deliberately conceals material information from them, he is guilty of fraud. McNally v United States 483 U.S. 350 (1987)

October 20, 2011
By: Shane-Christopher; Buczek
Secured Party UCC 1-308



**141 LED2D 242, 524 US 236  HOHN v UNITED STATES**



**ARNOLD F. HOHN**, Petitioner

*vs.*

**UNITED STATES**

**524 US 236, 141 L Ed 2d 242, 118 S Ct 1969**

[No. 96-8986]

**Argued March 3, 1998.**

**Decided June 15, 1998.**

**DECISION**

Supreme Court held to have jurisdiction to review Federal Court of Appeals' denial of certificate of appealability concerning Federal District Court's denial of accused's motion under 28 USCS § 2255 to vacate federal conviction.

**SUMMARY**

Under 28 USCS § 1254(1), the United States Supreme Court has jurisdiction to review, on certiorari, "[c]ases in" the Federal Courts of Appeals.  In House v Mayo (1945) 324 US 42, 89 L Ed 739, 65 S Ct 517-which involved a Federal District Court's refusal, after denying habeas corpus relief to a state prisoner, to issue a certificate of probable cause for an appeal to a Court of Appeals-the Supreme Court held that it lacked statutory certiorari jurisdiction to review refusals to issue certificates of probable cause, because under a predecessor of § 1254(1), such cases were never "in" the Courts of Appeals.  A similar jurisdictional issue later arose with respect to an accused who had been convicted of the use or carrying of a firearm in violation of 18 USCS § 924(c)(1).  After the accused was unsuccessful on direct review, the Supreme Court held in Bailey v United States (1995) 516 US 137, 133 L Ed 2d 472, 116 S Ct 501, that the term "use" in § 924(c)(1) required active employment of a firearm.  The accused then filed a motion under 28 USCS § 2255 to vacate his § 924(c)(1) conviction in light of the Bailey decision.  While this

2LED2D 

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

motion was pending before the United States District Court for the District of Nebraska, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) amended 28 USCS § 2253-which had referred to certificates of probable cause-so as instead to include provisions in 28 USCS § 2253(c) that (1) unless a "circuit justice or judge" issued a certificate of appealability, an appeal could not be taken to a Court of Appeals from a final order in (a) a habeas corpus proceeding involving a state prisoner, or (b) a § 2255 proceeding, and (2) a certificate of appealability could issue only if an applicant made a substantial showing of the denial of <*pg. 243> a constitutional right. The District Court denied the accused § 2255 relief, as the court expressed the view that he had waived his claim by failing, on direct review, to challenge a jury instruction which had defined use for purposes of § 924(c)(1). A panel of the United States Court of Appeals for the Eighth Circuit then denied the accused a certificate of appealability, as the panel expressed the view that his § 2255 claim was statutory, not constitutional, in nature (99 F.3d 892, 1996 US App LEXIS 28504). After the accused filed a petition for certiorari, a responsive brief for the United States (1) conceded, in agreement with the accused on this point, that his § 2255 claim was constitutional in nature; and (2) asked the Supreme Court to vacate the judgment below and to remand the case so that the Court of Appeals could reconsider in light of this concession.

On certiorari, the Supreme Court, in light of the position asserted in the responsive brief for the United States, vacated the Court of Appeals' decision and remanded the case for further consideration. In an opinion by Kennedy, J., joined by Stevens, Souter, Ginsburg, and Breyer, JJ., it was held that while the Supreme Court could not vacate and remand unless the court first had jurisdiction over the case, the court had jurisdiction over the case under § 1254(1), as (1) an application for a § 2253(c) certificate of appealability-such as the application involving the accused's § 2255 claim at issue-met the § 1254(1) description which confined the Supreme Court's certiorari jurisdiction under § 1254(1) to cases in the Courts of Appeals; and (2) the Supreme Court would overrule the portion of House v Mayo in which the court held that it lacked statutory certiorari jurisdiction to review refusals to issue certificates of probable cause, for (a) this portion was erroneous and should not be followed, and (b) stare decisis concerns did not require the Supreme Court to adhere to this portion of House v Mayo.

Souter, J., concurring, expressed the view that while he might have decided the case at hand on another ground involving the availability of a common-law writ of certiorari, he was persuaded to join the Supreme Court's opinion by (1) the weakness of the House v Mayo precedent concerning the statutory writ of certiorari, and (2) the advantage of having a clear majority for a rule governing the Supreme Court's jurisdiction.

Scalia, J., joined by Rehnquist, Ch. J., and O'Connor and Thomas, JJ., dissenting, expressed the view that (1) with respect to the statutory writ of certiorari, the Supreme Court's opinion

2LED2D



© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## ANNOTATION REFERENCES

Supreme Court's construction of 28 USCS § 2255, dealing with vacation of sentence in criminal case on grounds subjecting it to collateral attack. 41 L Ed 2d 1193.

Supreme Court's view as to what is a "case or controversy" within the meaning of Article III of the Federal Constitution or an "actual controversy" within the meaning of the Declaratory Judgment Act (28 USCS § 2201). 40 L Ed 2d 783.

What constitutes "use" of firearm for purposes of 18 USCS § 924(c)(1), providing penalty for use of firearm during drug trafficking crime or crime of violence. 125 ALR Fed 545.<*pg. 244>

## HEADNOTES

Classified to U.S. Supreme Court Digest, Lawyers' Edition

**Appeal § 242.5; Courts § 776 - certiorari - certificate of appealability - denial by Federal Court of Appeals - overruling prior decision**

1a, 1b, 1c, 1d, 1e. Under 28 USCS § 1254(1), the United States Supreme Court has jurisdiction, on certiorari, to review a denial, by a circuit judge or a panel of a Federal Court of Appeals, of a certificate of appealability, as (1) the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) amended 28 USCS § 2253 to include a provision in 28 USCS § 2253(c) that unless a "circuit justice or judge" issues a certificate of appealability, an appeal may not be taken to a Court of Appeals from a final order in (a) a habeas corpus proceeding involving a state prisoner, or (b) a proceeding under 28 USCS § 2255; (2) an application for a § 2253(c) certificate-such as the application at issue, which resulted in the denial, by a panel of a Court of Appeals, of a certificate of appealability concerning a Federal District Court's denial of an accused's § 2255 motion to vacate his conviction on a federal firearms charge-meets the § 1254(1) description which confines the Supreme Court's certiorari jurisdiction under § 1254(1) to "[c]ases in" the Courts of Appeals; and (3) the Supreme Court will overrule the portion of House v Mayo (1945) 324 US 42, 89 L Ed 739, 65 S Ct 517, in which the court held that because cases in which certificates of probable cause were refused were not "in" a Court of Appeals, the Supreme Court lacked statutory certiorari jurisdiction to review refusals to issue certificates of probable cause-the term "certificate of probable cause" having been used in § 2253, before AEDPA's enactment, instead of the term "certificate of appealability"-for (a) this portion was erroneous and should not be followed, and (b) stare decisis concerns do not require the Supreme Court to adhere to this portion of House v Mayo. (Scalia, J., Rehnquist, Ch. J., and O'Connor and Thomas, JJ., dissented from this holding.)

2LED2D 

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**Appeal § 1692.4 - remand - change in circumstances**

2a, 2b. In light of the position asserted in a brief for the United States that responded to an accused's petition for certiorari, the United States Supreme Court will vacate a Federal Court of Appeals' decision and will remand the case for further consideration, where (1) after a Federal District Court denied a motion by the accused under 28 USCS § 2255 to vacate his conviction on a federal firearms charge, a panel of the Court of Appeals denied the accused a certificate of appealability, as the panel expressed the view that his § 2255 claim was statutory in nature, rather than being a constitutional claim, as required by 28 USCS § 2253(c) after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996; (2) the responsive brief for the United States (a) concedes, in agreement with the accused on this point, that his § 2255 claim is constitutional in nature, and (b) asks the Supreme Court to vacate the judgment below and to remand the case so that the Court of Appeals can reconsider in light of this concession; and (3) while the Supreme Court may not vacate and remand unless the court first has jurisdiction over <*pg. 245> the case, the Supreme Court, overruling a portion of a prior decision, decides that it has jurisdiction over the case under 28 USCS § 1254(1), which authorizes the Supreme Court to review, on certiorari, cases in the Courts of Appeals.

**Appeal § 242.5 - certiorari - certificate of appealability - denial by Federal Court of Appeals**

3a, 3b, 3c, 3d, 3e, 3f, 3g, 3h, 3i. An application under 28 USCS § 2253(c) for a certificate of appealability-such as the application in question, which results in the denial, by a panel of a Federal Court of Appeals, of a certificate of appealability concerning a Federal District Court's denial of an accused's motion under 28 USCS § 2255 to vacate his conviction on a federal firearms charge-meets the 28 USCS § 1254(1) description which confines the United States Supreme Court's certiorari jurisdiction under § 1254(1) to "[c]ases in" the Courts of Appeals, where (1) after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, § 2253(c) includes a provision that unless a "circuit justice or judge" issues a certificate of appealability, an appeal may not be taken to a Court of Appeals from a final order in (a) a habeas corpus proceeding involving a state prisoner, or (b) a § 2255 proceeding; (2) the dispute over the accused's entitlement to a certificate falls within the general definition of a case, as the dispute is a proceeding seeking relief for an immediate and redressable injury, that is, allegedly wrongful detention in violation of the Federal Constitution; (3) there is adversity as well as the other requisite qualities of a case as the term is used in both Article III of the Constitution and § 1254(1); (4) cases are addressed in the ordinary course of the judicial process, under which the next step, when a District Court has denied relief and applicable requirements of finality have been satisfied, generally is review in a Court of Appeals; (5) it is consistent with the Federal Rules of Appellate Procedure and with the uniform practice of the Courts of Appeals to construe §

2LED2D



© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2253(c) as conferring the jurisdiction to issue certificates of appealability upon a Court of Appeals, rather than upon a judge acting under his or her own seal; (6) decisions regarding applications for certificates of appealability are judicial, rather than administrative, in nature; (7) the failure to satisfy a threshold prerequisite for Court of Appeals jurisdiction, such as the issuance of a certificate of appealability, does not prevent a case from being in the Court of Appeals for purposes of § 1254(1), even if the government declines to oppose a certificate application; (8) in contrast to the situation concerning § 2253(c), another recent amendment placed in 28 USCS § 2244(b)(3) a clear limit on the Supreme Court's certiorari jurisdiction to review a Court of Appeals' denial of a state prisoner's motion for leave to file a second or successive habeas corpus application; and (9) construing § 1254(1) to allow Supreme Court review of denials of certificates of appealability makes it unnecessary to invoke the court's extraordinary jurisdiction in routine cases which present important and meritorious claims. (Scalia, J., Rehnquist, Ch. J., and O'Connor and Thomas, JJ., dissented from this holding.)<*pg. 246>

cc.

⇔90656-111⇔
Jean Marie Mccarthy
Deputy Clerk WDNY
68 Court ST
Buffalo, NY 14202
United States

⇔90656-111⇔
Honorable Justice Thomas
United States Supreme Court
1 First Street, N.E.
Washington, DC 20543
United States

⇔90656-111⇔
Frank Perez
Deputy Clerk
40 Foley SQ
NEW YORK, NY 10007
United States

⇔90656-111⇔
Monica Richards
Foreign Agent
138 Delaware AVE
Buffalo, NY - 14202
United States

⇔90656-111⇔
Fox News Channel Studios
1211 Avenue OF THE Americas
Jude Andrew Napocitano
NEW YORK, NY 10036
United States

⇔90656-111⇔
Justice Antonin Scalia
Supreme Court Justice
One 1st Street, NE
Washington, DC - 20543
United States

⇔90656-111⇔
Ahronda Crossman
Deputy Clerk
40 Foley SQ
NEW YORK, NY 10007
United States

⇔90656-111⇔
Margart A Dale
Proskauer ROSE LLP
1585 Broadway
NEW YORK, NY 10036
United States

2LED2D

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

WESTERN DISTRICT OF NEW YORK

Shane C. Buczek                **JUDGMENT IN A CIVIL CASE**
                                             CASE NUMBER: 10-CV-382

v.

Constructive Statutory Trust;
et al,

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that the Petition, Amended Petition, and all of the habeas claims raised in the Motion for Leave to Amend are converted to applications under 28 U.S.C 2255. That the Government's Motion to Dismiss is granted and the Petition, Amended Petition are dismissed with prejudice. That all of habeas claims raised in the Motion for Leave to Amend are denied with prejudice. That Petitioner's Motion for Leave to Amend is granted insofar as all respondents except the United States of America are dismissed from this action.

That Petitioner's Motion for Judgment on the Pleadings; Motion to Take Judicial Notice of the Determination by the Department of Justice that "Title 18 (1948) [sic] is Unconstitutional and of the Fair Warning Doctrine"; and "Motion/Petition for Determination of a Question of Jurisdiction" are dismissed as moot.

A certificate of appealability shall not issue and leave to appeal as a poor person from this Decision and Order is denied.

Date: September 30, 2011                    MICHAEL J. ROEMER, CLERK

                                                          By:s/ Diane Radloff
                                                            Deputy Clerk

## ⋆ Final Steps ⋆

Usually, House and Senate bills on the same topic are different. Their subcommittees may have included different issues. When the bills reach floor debate, senators and representatives may have raised new concerns. One house may have added amendments that the other house did not. To become a law, House and Senate versions of a bill must be exactly the same.

Once the two versions of a bill have passed their houses, the bills go to a conference committee. The committee is made up of members from both houses and both parties. The committee works out the differences between the two bills. The **compromise bill** is then sent back to the two houses for a vote.



A public hearing of the Joint Congressional Intelligence Committee in 2002

If the compromise bill is passed in both houses, it is sent to the president. The president may sign the bill and it becomes a law. The president may also choose not to take action. If the president holds the bill for ten days, it becomes a law. There is one exception. If Congress adjourns during those ten days, then the bill is vetoed. This is called a **pocket veto**. The president may also veto a bill outright. Then he sends the bill back to Congress with an explanation of why he vetoed it.

Congress may choose to rework the bill and try to pass a new version. However, Congress may also try to **override** the president's veto. To do this, both houses must repass the bill with a two-thirds majority vote. If either house fails to get a two-thirds majority vote, the bill dies.



President George W. Bush signed the Garrett Lee Smith Memorial Act on October 21, 2004.

## Putting It All Together

Write a one-paragraph summary explaining how a bill becomes a law. Refer to the information in this lesson, and use as many vocabulary words as you can.

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

# 𝔗𝔬 𝔞𝔩𝔩 𝔱𝔬 𝔴𝔥𝔬𝔪 𝔱𝔥𝔢𝔰𝔢 𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔰 𝔰𝔥𝔞𝔩𝔩 𝔠𝔬𝔪𝔢. 𝔊𝔯𝔢𝔢𝔱𝔦𝔫𔤤:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, ...der the seal of the National Archives of the United States, that the attached reproduction(s) is a true and ...t copy of documents in his custody.

| SIGNATURE | | |
|---|---|---|
| *[signature]* | | |
| NAME Richard H. Hunt | | DATE 10/01/10 |
| TITLE Director Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY The National Archives Washington, D.C. 20408 | | |

May 12, 1947 "HR 3190"

NA FORM APR 85 140

---

this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status ...

...resent ... ...eration of the bill? ...e was n... ...ction.

...Clerk r... ...e bill the second tim...

M... ...ALTER. ... ...eaker, I offer an amen... ...t.

The ... read as ...:

Amen... offered b... WALTER: On page 434, ..., after th... "of", strike out "three... ...insert "five...

Mr. W... ...R. Mr. S... ...r, the amendment ... ...ave just h... ...eported would hav... ...effect, if ... ...d, of increasing the ... ...bership of t... ...role board from thr... ...five.

At the last ses... ...f the Congr... of the subcommit... ...f the Com... on the Judiciary, i... ...ying the leg... tion which we hope... ...ht have the ... fect of cutting dow... ...criminal ra... in this country, four... ...erfectly appalling situation in t... ...role board. That board of three m... ...rs actually interviews upward of 1... ...prisoners each year. That is, perso... ...terviews. In addition to that, they h... ...review the cases acted on after per... ...interviews.

There are 21 criminal insti... ...s in the United States that must b... ...ted by this Board at regular interv... ...So they have a perfectly impossible jo... the result that men are paroled ac... ing to formula who should be comp... to serve their full sentence. I am ... thinking about those men who are e... gible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases;

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think ...ere i... no objection to it. We have a ... which can be called up to do this ...g.

... WALTER. The gentleman is cor... ...t we are this far. I do not think th... ...any doubt but that the Judiciary Co... ...e would unanimously approve a se... bill, but we have gotten this far w... ...s legislation and it certainly seems ... ...the situation is so critical that we ... ...t to act as quickly as we possibly c... That is the reason I have offered this ...endment at this time.

The SPEA... ...ER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to, before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases;

that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

*May 12, 1947 HR 3190 not passed with 218*

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

XCIII——319

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that

they were purely a codification. But there are some changes in this bill (H. R. 8198), I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

*[handwritten annotation: MUST HAVE two-thirds = 218]*

LORRAINE C. MILLER
CLERK

DEBORAH M. SPRIGGS
DEPUTY CLERK

ROBERT F. REEVES
DEPUTY CLERK

MARIA A. LOPEZ
DEPUTY CLERK

H-154 THE CAPITOL

# Office of the Clerk
## U.S. House of Representatives
### Washington, DC 20515-6601

August 24, 2010

Thank you for contacting the Office of the Clerk.

Our office has conducted research of the House Journal and the Congressional Record in regards to HR 3190 and the voice vote that was taken on May 12, 1947. After researching these official proceedings of the US House of Representatives we have been unable to find the names of the 44 Members who responded to the voice vote. We have included pages from the House Journal and the Congressional Record that shows the proceedings of that day as far as the quorum is concerned. The text of HR 3190 passed on May 12, 1947 it was debated, engrossed and the motion was laid on the table. HR 3190 was passed by the House and Senate on June 18, 1948 and became Public Law 80-772 on June 25, 1948. The House Convened on December 19, 1947 for daily business the start of a new session of Congress was January 6, 1948. We hope the provided information and documentation will aid in your research.

Legislative Resource Center

Office of the Clerk

US House of Representatives

> **stop and think**
>
> This section is titled "The First Steps." How many steps are discussed in this section? Look again at the list of vocabulary words that you made for the Thinking on Your Own activity. Work with a partner to add words to your vocabulary list.

Once the hearings are over, the subcommittee meets to "mark up" the bill. The members go through the bill and make changes to it. A majority of members must agree to every change.

Once the changes are made, the subcommittee has several choices. It may pigeonhole the bill or vote to kill it outright. Members may also vote to send the revised bill back to the standing committee. The standing committee can also kill the bill or report the bill out of committee. If the bill is reported, it is sent to the House or the Senate for debate.

## Floor Action

In the House of Representatives, the Rules Committee sets a time limit for floor debate. The committee also decides whether amendments may be added to the bill during debate. The Senate does not ban amendments or have time limits.

The clerk of the House or the Senate reads the bill for the second time. Amendments may be proposed after each section is read. A majority of members must approve an amendment before it can be added. Amendments are proposed for several reasons. Sometimes members believe that the changes are truly important and needed. At other times, opponents of a bill add amendments as a way to kill the bill.

Once the bill is read and all the amendments have been added, the bill is read again. After this third reading, a vote is taken. A **quorum**, or majority, of senators or representatives is needed for a vote to take place. If a quorum is not present, no vote can be taken. To pass a bill, a majority of the members present must vote to approve it. ↑ 218 Needed

The House uses voice votes, standing votes, and electronic voting. In a voice vote, members call out either "aye" or "no." In a standing vote, members stand to show whether they are for or against a bill. In 1973, the House introduced electronic voting. Members push buttons at their seats to vote yes or no. Each member's vote appears on a large panel behind the Speaker.

The Senate also uses voice and standing votes. It uses a roll-call vote instead of electronic voting. Each senator calls out his or her vote.